# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| LABORATOIRES MAJORELLE SAS, MAJORELLE INTERNATIONAL SARL (dba Majorelle Luxembourg), Plaintiffs, -against- APRICUS BIOSCIENCES, INC., NEXMED (U.S.A.), INC., FERRING INTERNATIONAL CENTER S.A. (dba Ferring Pharmaceuticals), Defendants. | Index No.: SUMMONS Date Index No. Purchased: July 25, 2017 Plaintiff designates New York County as the place of trial. The basis of venue is CPLR § 501. |

To the above-named defendants:

YOU ARE HEREBY SUMMONED and required to serve upon plaintiffs' undersigned

attorneys an answer to the complaint in this action within twenty (20) days after the service of

this summons, exclusive of the day of service (or within thirty (30) days after the service is

complete if this summons is not personally delivered to you within the State of New York), and

in the case of your failure to appear or answer, judgment will be taken against you by default for

the relief demanded in the complaint.

Dated: New York, New York
       July 25, 2017

OLSHAN FROME WOLOSKY LLP
By:

Brian A. Katz
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

*Attorneys for Plaintiffs*

1

Case 1:17-cv-06625-AT-DCF   Document 1-1   Filed 08/30/17   Page 3 of 22

TO:    APRICUS BIOSCIENCES, INC.,
11975 El Camino Real, Suite 300, San Diego, California 92130

NEXMED (U.S.A.), INC.,
11975 El Camino Real, Suite 300, San Diego, California 92130

FERRING INTERNATIONAL CENTER S.A.(dba Ferring Pharmaceuticals),
Chemin de la Vergognausaz 50, 1162 Saint-Prex, Switzerland

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

LABORATOIRES MAJORELLE SAS,
MAJORELLE INTERNATIONAL SARL
  (dba Majorelle Luxembourg)

                              Plaintiffs,

            -against-

APRICUS BIOSCIENCES, INC.,
NEXMED (U.S.A.), INC.,
FERRING INTERNATIONAL CENTER S.A.
  (dba Ferring Pharmaceuticals),

                          Defendants.

Index No.:

COMPLAINT

Plaintiffs, Laboratoires Majorelle SAS and Majorelle International SARL (hereinafter collectively "Majorelle"), by and through their attorneys, for their Complaint against the Defendants, Apricus Biosciences, Inc., NexMed (U.S.A.), Inc. and Ferring International Center S.A., allege the following:

## NATURE OF THE ACTION

1. This is an action seeking a declaratory judgment, pursuant to CPLR § 3001 and § 3017(b), that certain portions of a non-compete clause of a License Agreement are unenforceable under the antitrust laws of France, the European Union and/or the United States, and, accordingly, modifying the License Agreement to remove such unenforceable portions and seeking recovery of all damages arising therefrom.

2. This is also an action seeking a declaratory judgment pursuant to CPLR § 3001 and § 3017(b), that the attempted assignment of the License Agreement, a Manufacturing and Supply Agreement, and various European patents and trademarks, from Apricus

1

FILED: NEW YORK COUNTY CLERK 07/25/2017 08:06 PM
NYSCEF DOC. NO.

INDEX NO. 655028/2017
RECEIVED NYSCEF: 07/25/2017

Case 1:17-cv-06625-AT-DCF   Document 1-1   Filed 08/30/17   Page 5 of 22

Biosciences, Inc. to Ferring International Center S.A. breaches the License Agreement and the attempted assignment is therefore null and void.

3. This is also an action seeking all damages arising from the breach of the Manufacturing and Supply Agreement by NexMed (U.S.A.), Inc. and/or its parent Apricus Biosciences, Inc. (hereinafter "Apricus"). NexMed (U.S.A.), Inc. and/or Apricus breached the Manufacturing and Supply Agreement, misrepresented a material characteristic of its pharmaceutical product and fraudulently induced Majorelle into purchasing too large a quantity of the pharmaceutical product, which had an actual shelf life considerably shorter than that alleged by NexMed (USA), Inc. and/or Apricus. Therefore, Majorelle had to discard a large quantity of the purchased pharmaceutical product to its financial detriment.

## THE PARTIES

4. Plaintiff Laboratoires Majorelle SAS is a company of France with a principal place of business at 12 Rue de Berri, 75008 Paris, France.

5. Plaintiff Majorelle International SARL is a company of Luxembourg with a principal place of business at 22 Rue Marie Adelaide, L2128 Luxembourg.

6. Upon information and belief, Defendant Apricus is a company of Nevada with a principal place of business at 11975 El Camino Real, Suite 300, San Diego, California 92130.

7. Upon information and belief, Defendant NexMed (U.S.A.), Inc. (hereinafter "NexMed USA") is a company of Delaware with a principal place of business at 11975 El Camino Real, Suite 300, San Diego, California 92130. Upon information and belief, NexMed USA is a wholly owned subsidiary of Apricus.

2

8. Upon information and belief, Defendant Ferring International Center S.A., dba Ferring Pharmaceuticals (hereinafter "Ferring"), is a company of Switzerland with a principal place of business at Chemin de la Vergognausaz 50, 1162 Saint-Prex, Switzerland.

## JURISDICTION AND VENUE

9. The Parties contractually consented to "the exclusive jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York for any action, suit, or proceeding … arising out of or relating to this Agreement …." The Parties also contractually consented that venue in this judicial district is proper.

## BACKGROUND

10. Laboratoires Majorelle SAS was founded in 2001, and develops and distributes pharmaceuticals in France. Laboratoires Majorelle currently has approximately fifteen employees plus approximately forty-six direct employees in its subsidiary NexMed Pharma France. NexMed Pharma France was formerly a subsidiary of Apricus.

11. Laboratoires Majorelle SAS is a subsidiary of Majorelle International SARL (dba Majorelle Luxembourg).

12. Upon information and belief, Apricus is a bio-pharmaceutical company which develops products in the areas of urology and rheumatology. Upon information and belief, for the fiscal year ended December 31, 2016, Apricus received license fee revenue of approximately $4,000,000,000, royalty revenue of approximately $1,088,000,000 and product sales of approximately $675,000,000 for total revenue of approximately $5,763,000,000.

13. Upon information and belief, Apricus developed a pharmaceutical product under the brand Vitaros® for the treatment of erectile dysfunction which was in–licensed from a third party.

3

14. Apricus is also developing a pharmaceutical product under the brand RayVa® for the treatment of Raynaud's Phenomenon associated with scleroderma.

15. Upon information and belief, NexMed USA, NexMed Holdings, Inc. and NexMed International Limited are wholly owned subsidiaries of Apricus.

## I.    The License Agreement

16. On November 12, 2013, Laboratoires Majorelle and Majorelle International entered into a License Agreement with Apricus, NexMed USA, NexMed Holdings, Inc. and NexMed International Limited.  In this License Agreement, Apricus and/or its subsidiaries granted to Majorelle an exclusive, royalty-bearing license to Apricus' Vitaros® European patents and trademarks for the territory of France, Monaco and French speaking Africa.

17. This License Agreement contains a non-compete clause in Section 6.1 which recites "During the Term and for a period of three (3) years thereafter, Licensee, its Affiliates, its sublicensees and other Persons acting under its or their authority shall not, directly or indirectly,  (i) Commercialize any product containing alprostadil in combination with DDAIP.HCL (other than the Licensed Product), (ii) Commercialize any product that is intended for use in the Field (other than the Licensed Product) or (iii) Commercialize any generic version of the Licensed Product."  This License Agreement defines "Field" as "the treatment of human, male erectile dysfunction for authorized use only."

18. Section 12.3.3 of this License Agreement specifies that the non-compete clause in Section 6.1 shall survive termination of the License Agreement for a period of three (3) years.

19. This License Agreement further has an assignment clause at Section 13.4 which recites "Neither Party shall assign its rights or delegate its obligations under this Agreement, in whole or in party, by operation of law or otherwise, to any Third Party without the prior

4

written consent of the other Party; *provided, however*, … (ii) Apricus may assign this Agreement or delegate all or any of its rights or obligations under this Agreement without requiring the consent of Licensee to any Third Party which acquires or succeeds to all substantially all of the assets of the business of Apricus in the Territory to which this Agreement relates. Any assignment not in accordance with this Section 13.4 shall be null and void."

20. This License Agreement additionally includes a severability clause at Section 13.18 which recites "Should one or more of the provisions of this Agreement be or become illegal, invalid, void or unenforceable as a matter of law, then such provision will be ineffective only to the extent of such illegality, invalidity or unenforceability, without invalidating the remainder of this Agreement, and the Parties agree to substitute a legal, valid and enforceable provision therefore which, as nearly as possible, achieves the desired economic effect and mutual understanding of the Parties under this Agreement."

## II. The Manufacturing and Supply Agreement

21. On September 10, 2014, NexMed USA and Majorelle International SARL (dba Majorelle Luxembourg) entered into the Manufacturing and Supply Agreement. Under Section 2.1.1 of this Manufacturing and Supply Agreement "(i) Apricus shall use Reasonable Efforts to supply the Products to Majorelle and (ii) Majorelle shall purchase from Apricus all of its requirements for the Products for Commercialization in the Field in the Territory." The defined Products are the Vitaros® pharmaceutical products, and the defined Territory is France, Monaco and French speaking Africa. Apricus authorized various contract manufacturers to supply the Vitaros® pharmaceutical to Majorelle.

5

22. This Manufacturing and Supply Agreement further recited at Section 2.2.4 that "All Product released to Majorelle meet the Product Specifications and is expected to have a minimum remaining Shelf Life of approximately fifteen (15) months when made available to Majorelle for pickup."

23. Based on information supplied by Apricus, the French Agence Nationale de Sécurité du Médicament (ANSM) authorized Majorelle to sell the Vitaros® product in France through an official Autorisation de Mise sur le Marché (AMM) (hereinafter "Marketing Authorization"). This Marketing Authorization states that the Vitaros® 300 microgram cream has an eighteen month shelf life in Section 6.3 thereof based on the Apricus supplied information.

24. Despite representations to the contrary, the Vitaros® pharmaceutical products supplied by or on behalf of Apricus, however, only had an actual shelf life of twelve months or less in 2015 and 2016.

### III.    Majorelle Markets Vitaros®

25. In 2015, 2016 and the first half of 2017, Majorelle successfully sold Vitaros® product to wholesalers in France, with the sales revenues increasing each year.

26. In 2016 and the first quarter of 2017, Majorelle and Apricus discussed modifying the non-compete clause of the License Agreement to allow Majorelle to sell generic erectile dysfunction pharmaceutical products in France. The Parties had reached an agreement in principle as to this modification in the first quarter of 2017, subject to finalizing the contract details.

27. Majorelle relied upon this agreement in principle for the non-compete contract modification and incurred expenses associated therewith. Majorelle has not yet sold its

6

purchased inventory of generic erectile dysfunction pharmaceutical products in France, Monaco or French speaking Africa.

### IV.   Ferring Acquires Certain Rights to Vitaros® From Apricus

28. On March 10, 2017, Majorelle received a general press release from Ferring and Apricus stating that "Ferring Pharmaceuticals and Apricus Biosciences recently announced an agreement pursuant to which Ferring purchased Apricus' ex-U.S. assets and rights related to the development and commercialization of Vitaros® (alperostadil cream).  On the terms and conditions set forth in the agreement, Apricus assigned to Ferring, and Ferring assumed, the existing license agreements and certain related ancillary agreements between you and Apricus, thereby giving Ferring ownership of and responsibility for the ex-U.S. Vitaros business."

29. Upon information and belief, Apricus and Ferring entered into an asset purchase agreement on March 8, 2017, pursuant to which Apricus sold to Ferring its assets and rights related to Vitaros® outside of the United States for approximately $11,500,000, in addition to paying $700,000 for the delivery of certain product-related inventory and two additional quarterly payments totaling $500,000 related to transition services.

30. During the second quarter of 2017, Majorelle expressed its desire to Ferring to modify the non-compete section of the License Agreement.  Ferring declined to modify the License Agreement and instead, threatened that Majorelle would be held in breach of the License Agreement if it sold generic erectile dysfunction pharmaceutical products in France during the term of the Agreement.

31. Upon information and belief, Majorelle's ability to sell generic erectile dysfunction pharmaceutical products in France will increase its sales of the licensed Vitaros®

7

Case 1:17-cv-06625-AT-DCF   Document 1-1   Filed 08/30/17   Page 11 of 22

pharmaceutical product. Upon information and belief, Apricus repeatedly concurred in this marketing assessment.

32. Upon information and belief, Ferring is a very large multi-national pharmaceutical company with its and its affiliates having total revenues in 2016 of more than $1,500,000,000.

## FIRST CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
#### (Violation of French, European Union and/or United States
#### Antitrust Laws Requiring Contract Modification)

33. Plaintiffs repeat and re-allege each and every allegation set forth above as it fully set forth herein.

1. Article 101(1) of the Treaty on the Functioning of the European Union ("TFEU") states as follows:

1. The following shall be prohibited as incompatible with the internal market: all agreements between undertakings, decisions by associations of undertakings and concerted practices which may affect trade between Member States and which have as their object or effect the prevention, restriction or distortion of competition within the internal market, and in particular those which:

(a) directly or indirectly fix purchase or selling prices or any other trading conditions;

(b) limit or control production, markets, technical development or investment;

(c) share markets or sources of supply;

(d) apply dissimilar conditions to equivalent transactions with other trading parties, thereby placing them at a competitive disadvantage;

8

Case 1:17-cv-06625-AT-DCF   Document 1-1   Filed 08/30/17   Page 12 of 22

(e) make the conclusion of contracts subject to acceptance by the other parties of

supplementary obligations which, by their nature or according to commercial

usage, have no connection with the subject of such contracts.

2. Article L. 420-1 of the French Business Code provides:

Concerted actions, agreements, express or tacit undertakings or coalitions shall be

prohibited, even through the direct or indirect intermediation of a company in the

group established outside France, where they have the aim or may have the effect

of preventing, restricting or distorting the free competition in a market,

particularly where they are intended to:

1. Limit access to the market or the free exercise of competition by other

undertakings;

2. Prevent price setting by the free play of market forces, by artificially

encouraging the increase or reduction of prices;

3. Limit or control production, opportunities, investments or technical progress;

4. Share out markets or sources of supply.

3. Non-competition clauses are contrary to Article L. 420-1 of the French Business Code and

101(1) of the TFEU mentioned above where they are disproportionate in scope or duration to

the objective pursued and if that their actual implementation leads to an undue distortion of

competition (*Reuter/Basf*, 26 July 1976, 76/743/CEE; *IV/30.389 – Nutricia/de Rooij and*

*IV/30,408 – Nutricia/Zuid-Hollandse Conservenfabriek*, 12 December 1983, *83/670/EEC;*

*IV/30,863 – BPCL/ICI*, 19 July 1984, 84/387/EEC; *Remia v Commission of the European*

*Communities*, 11 July 1985, *C-42/84; Portugal Telecom v European Commission*, 28 June

2016, T-208/13; Advice of the French Competition Council of 29 May 1986; Decision of the

9

Case 1:17-cv-06625-AT-DCF   Document 1-1   Filed 08/30/17   Page 13 of 22

French Competition Council No. 98-D-67 of 27 Oct. 1998; No. 99-MC-03 of 16 Feb. 1999; No. 00-D-14 of 3 May 2000; No. 00-D82 of 26 Feb. 2001; No. 01-D-55 of 21 Sept. 2001; No. 07-D-16 of 9 May 2007).

4. A non-compete clause is considered to be lawful under the TFEU and the French Business Code only if (a) the non-compete obligation contained is necessary and (b) the scope of this non-compete obligation is strictly adjusted to the necessary function it fulfills.

5. In the present situation, the part of the non-compete clause that relates to the prohibition to "commercialize any product that is intended for use in the Field" is not necessary as to ensure the success of the patent license. Instead, the protection of Apricus' and/or Ferring's legitimate interest is already ensured by the prohibition for Majorelle to "commercialize any product containing alprostadil in combination with DDAIP. HCI", the active ingredient of Vitaros®. Therefore, such a restriction was not the indispensable accessory of the contract since the generic pharmaceutical products that Majorelle is interested to commercialize are not substitutable for Vitaros®.

6. The specific scope of the non-compete obligation in question is manifestly disproportionate to the original purpose of the contract in which it is included. First, such obligation aims at incorporating the entire demand for male erectile treatment and therefore, at covering customers of non-competitive products, without any justification. Second, it appears that the non-compete obligation is for a duration beyond the life of the Apricus and/or Ferring patent(s).

7. Consequently, it results from the foregoing that the non-compete obligation in the Apricus/Ferring License Agreement violates Article 101(1) of the TFEU and L.420-1 of the French Business Code because it is not at all necessary for the achievement of the objective

10

of the contract and because it restricts competition in the broad field of the treatment of human, male erectile dysfunction without any legitimate justification.

8. The License Agreement additionally prevents Majorelle from selling generic erectile dysfunction pharmaceuticals in the United States, even for unpatented products, during the term of the contract and for a period of three years thereafter. Nevertheless, Majorelle was not granted any license or rights to sell any product in the United States (patented, trademarked or not) by Apricus and/or Ferring.

9. The non-compete Sections 6.1(ii) and (iii) violate at least Section 1 of the Sherman Act because they constitute contractual obligations that result in an unreasonable restraint of trade or commerce in the relevant market. Majorelle has standing to assert the Sherman Act portion of this cause of action since: (a) the non-compete portion of the License Agreement creates a causal connection between Apricus/Ferring's violation and the harm to Majorelle, (b) the noted non-compete sub-sections create an improper motive beyond a reasonable furtherance of the French patent and trademark license, (c) the injury to Majorelle and the restraint of U.S. competition is of the type that the Sherman Act prevents, (d) the injury to Majorelle and U.S. competition is directly connected to the restraint in the generic erectile dysfunction market in the U.S., (e) Majorelle is ready to sell generic erectile dysfunction products in France and has the future ability to directly or indirectly sell same in the U.S. such that the injury is not speculative, and (f) there is minimal, if any, risk of duplicative recoveries especially since a modification of the License Agreement by the Court would resolve most, if not all, of the U.S. concerns.

10. The non-compete Sections 6.1(ii) and (iii) of the License Agreement violate French, European and/or United States antitrust laws.

11

11. Upon information and belief, Majorelle's inability to sell generic erectile dysfunction pharmaceutical products in France, Monaco and the United States under the non-compete clause of the License Agreement is harmful to competition in France, Monaco and the United States, and has prevented such sales by Majorelle or its affiliates, thereby monetarily harming Majorelle.

12. Upon information and belief, modification of the non-compete clause of the License Agreement by the Court will rectify future French, European Union and United States antitrust law concerns.

13. Majorelle has been financially harmed by the non-compete clause of the License Agreement.

14. The Court is requested to invoke the severability clause of Section 13.18 of the License Agreement to strike Sections 6.1(ii) and 6.1(iii) of the License Agreement without otherwise terminating the contract, thereby overcoming the French, European Union and United States antitrust law problems.

15. Majorelle is entitled to injunctive and monetary relief from Apricus, NexMed USA and/or Ferring due to their inclusion and enforcement of Section 6.1.

**SECOND CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
**(Modification of Non-Compete For Violation of New York Common Law)**

16. Plaintiffs repeat and allege each and every allegation set forth above as if fully set forth herein.

17. Section 6.1(ii) of the License Agreement is invalid and unenforceable at least because it is: (i) unreasonably long in duration, (ii) unreasonably broad in scope because the definition of "Field" includes products that are not competitive with the Licensed Product, (iii) unreasonably broad in geographic scope because it applies to geographic areas, including the

12

United States, that are not within the "Territory" (defined in Section 1.65) that is the subject of the License Agreement, and/or (iv) does not protect a legitimate business interest.

18. Section 6.1(iii) of the License Agreement is invalid and unenforceable at least because it is: (i) unreasonably long in duration, (ii) unreasonably broad in geographic scope because it applies to geographic areas, including the United States, that are not within the "Territory" (defined in Section 1.65) that is the subject of the License Agreement, and/or (iii) does not protect a legitimate business interest.

### THIRD CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
### (Invalidation of Assignment Due to Breach of Contract)

19. Plaintiffs repeat and allege each and every allegation set forth above as if fully set forth herein.

20. Apricus, directly or through its affiliates, still owns various European trademark and patent rights for its RayVa® pharmaceutical product.  These European rights cover France and Monaco among other European countries. For example, European Community Trademark Registration No. 014681308 and European Patent Office Patent Publication Nos. 2 693 877, 2 646 015, 2 211 975, and 2 073 634.

21. Apricus, either directly or through its affiliates, did not sell its European, French and Monaco intellectual property for the RayVa® pharmaceutical product to Ferring.

22. Accordingly, Apricus, either directly or through its affiliate, did not sell "all or substantially all of the assets of Apricus in the Territory to which this Agreement relates."

23. Majorelle did not consent to the assignment of the License Agreement from Apricus to Ferring, as required by Section 13.4 of the License Agreement.

13

24. Therefore, the attempted assignment of the License Agreement from Apricus to Ferring is null and void.

25. The Court is requested to declare that the attempted assignment in 2017 of the License Agreement, the Manufacturing and Supply Agreement, and the associated non-U.S. Vitaros® intellectual property, from Apricus (and/or its subsidiaries) to Ferring is null and void. In other words, all of the intellectual property rights outside of the United States pertaining to the Vitaros® pharmaceutical product, as well as the License Agreement and the Manufacturing and Supply Agreement with Majorelle, remain owned by Apricus, NexMed USA and/or their wholly owned subsidiaries.

26. Majorelle is entitled to injunctive and monetary relief from Apricus, NexMed USA and/or Ferring due to their attempted assignment.

## FOURTH CAUSE OF ACTION
## AGAINST APRICUS and NEXMED USA
### (Breach of Manufacturing and Supply Agreement Regarding Shelf Life)

27. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

28. The Manufacturing and Supply Agreement is a valid contract that was formed and entered into between Majorelle International and NexMed USA.

29. Majorelle International (through its affiliates such as Majorelle Laboratoires) performed in accordance with the Manufacturing and Supply Agreement.

30. NexMed USA (and its affiliates such as Apricus) failed to substantially perform as required in the Manufacturing and Supply Agreement.

31. After receiving at least one initial large order of Vitaros® product from Apricus' contract manufacturer, Majorelle had to discard a significant quantity of the Vitaros® product due to

14

the actual shorter than represented shelf life of same.  This resulted in significant monetary damages to Majorelle.

32. Apricus and/or NexMed USA breached Section 2.2.4 of the Manufacturing and Supply Agreement due to the Vitaros® pharmaceutical product having an actual shelf life materially less than that required by Section 2.2.4 of the Manufacturing and Supply Agreement.

33. Majorelle is entitled to monetary relief due to Apricus' and/or NexMed USA's breach of the Manufacturing and Supply Agreement.

### FIFTH CAUSE OF ACTION
### AGAINST APRICUS and NEXMED USA
### (Common Law Fraudulent Inducement, Misrepresentation and
### Unjust Enrichment Regarding Shelf Life)

34. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

35. Apricus represented (directly or through its affiliates) in connection with its obtaining the French Marketing Authorization that the shelf life of its Vitaros® pharmaceutical product was eighteen (18) months.

36. Apricus represented in the Manufacturing and Supply Agreement that the shelf life of its Vitaros® pharmaceutical product was at least fifteen (15) months.

37. Apricus' above-described representations as to the shelf life of its Vitaros® pharmaceutical product was false, at least in years 2015 and 2016.

38. Apricus' above-described representations as to the shelf life of its Vitaros® pharmaceutical product were material.

39. Apricus knew that the above-described representations as to the shelf life of its Vitaros® pharmaceutical product were false.

15

40. Apricus' above-described representations as to the shelf life of its Vitaros® pharmaceutical product occurred in the U.S. and Europe before Majorelle purchased the Vitaros® product.

41. Apricus intended that the above-described representations as to the shelf life of its Vitaros® pharmaceutical product would be relied upon by Plaintiffs in the purchase of its Vitaros® pharmaceutical product.

42. Plaintiffs were not aware that the above-described representations as to the shelf life of its Vitaros® pharmaceutical product were false.

43. Plaintiff had the right to, and did in fact, rely upon the above-described representations as to the shelf life of its Vitaros® pharmaceutical product when it purchased the Vitaros® pharmaceutical product from Apricus, its affiliates and/or its authorized contact manufacturers.

44. Upon information and belief, Apricus and/or its affiliates received profits from Majorelle's purchase of the Vitaros® pharmaceutical product.

45. Majorelle had to discard some of its Vitaros® pharmaceutical product due to the actual versus misrepresented shelf life.

46. Majorelle was financially harmed by having to discard some of the Vitaros® pharmaceutical product and, Apricus and/or its subsidiaries were unjustly enriched from sale of such product to Majorelle.

47. Accordingly, Apricus (directly or through its affiliates) knowingly and fraudulently induced the purchase of its Vitaros® pharmaceutical product by Majorelle (directly or through its affiliate) and misrepresented the shelf life of its Vitaros® pharmaceutical product as being longer than the actual shelf life of such product.

16

48. Majorelle is entitled to monetary relief for Apricus' and/or its affiliates fraudulent inducement and misrepresentation upon which Majorelle relied, and Apricus should disgorge its unjustly received profits therefrom.

**WHEREFORE,** Plaintiffs respectfully request that this Court grant the following relief:

A.    On the First Cause of Action, entering an order striking Sections 6.1(ii) and 6.1(iii) and/or otherwise modifying Section 6.1 of the License Agreement to comply with at least the French, European Union and/or United States antitrust laws, thereby allowing Majorelle to sell generic erectile dysfunction pharmaceutical products in France, Monaco and the United States without breach or termination of the License Agreement;

B.    On the First Cause of Action, awarding damages to Plaintiffs in the amount to be proven at trial, plus punitive damages in the amount necessary to deter future misconduct by the Defendants;

C.    On the Second Cause of Action, entering an order striking Sections 6.1(ii) and 6.1(iii) and/or otherwise modifying Section 6.1 of the License Agreement to allow Majorelle to sell generic erectile dysfunction pharmaceutical products in France, Monaco and the United States without breach or termination of the License Agreement;

D.    On the Second Cause of Action, awarding damages to Plaintiffs in the amount to be proven at trial, plus punitive damages in the amount necessary to deter future misconduct by the Defendants;

E.    On the Third Cause of Action, entering an order that the attempted assignment between Apricus and Ferring is null and void, with ownership remaining in the name of Apricus and/or its wholly owned subsidiaries;

F.      On the Fourth Cause of Action, awarding damages to Plaintiffs in the amount to be proven at trial in excess of $500,000;

G.      On the Fifth Cause of Action, awarding damages to Plaintiffs in the amount to be proven at trial in excess of $500,000, disgorgement of the profits by the Defendants, plus punitive damages in the amount and necessary to deter future misconduct by the Defendants; and

H.      Awarding such other damages and relief as the Court deems just and proper, including, but not limited to, awarding Plaintiffs their costs and expenses, including attorneys' fees incurred in connection with this action.

18

Dated: July 25, 2017                    By: _____
New York, New York                          Brian A. Katz

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
New York, New York 10019
Telephone: (212) 451-2300
Facsimile:  (212) 451-2222

*OF COUNSEL*
HARNESS, DICKEY & PIERCE, PLC
    Monte L. Falcoff
    Michigan Bar No. P48015
    (*Pro Hac Vice* application to be submitted)
    Glenn E. Forbis
    Michigan Bar No. P52119
    (*Pro Hac Vice* application to be submitted)
    Jewell N. Briggs
    Michigan Bar No. P81246
    (*Pro Hac Vice* application to be submitted)

HARNESS, DICKEY & PIERCE, PLC
5445 Corporate Drive, Suite 200
Troy, Michigan 48098
Telephone: (248) 641-1600
Facsimile: (248) 641-0270

*Attorneys for Plaintiffs*

19