```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
LABORATOIRES MAJORELLE SAS, and
MAJORELLE INTERNATIONAL SARL (dba
Majorelle Luxembourg),

                        Plaintiffs,

        -against-

APRICUS BIOSCIENCES, INC., NEXMED
(U.S.A), INC., and FERRING
INTERNATIONAL CENTER S.A. (dba Ferring
Pharmaceuticals),

                        Defendants.
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/21/2018_

17 Civ. 6625 (AT)

**ORDER**

ANALISA TORRES, District Judge:

On July 25, 2017, Plaintiffs, Laboratoires Majorelle SAS and Majorelle International SARL (d/b/a Majorelle Luxembourg) (collectively, "Majorelle"), brought this action against Defendants, Apricus Biosciences, Inc. and NexMed (U.S.A.), Inc. (collectively, "Apricus") and Ferring International Center S.A. ("Ferring"), in Supreme Court, New York County. Compl., ECF No. 1-1. Plaintiffs allege violations of United States, French, and European Union antitrust laws, illegal restraint on trade, breach of contract, fraud, and unjust enrichment. Defendants removed the case to this Court on August 30, 2017. ECF No. 1. On October 16, 2017, Plaintiffs filed an amended complaint (the "complaint"). ECF No. 40. Defendants move to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), ECF Nos. 55, 58, and move in the alternative to strike Plaintiffs' request for punitive relief, ECF Nos. 56, 58.[1] For the reasons stated below, the motions to dismiss are GRANTED in part, and the motions to strike are DENIED as moot.

---

[1] Separate from Apricus, Ferring submits a motion to dismiss and motion to strike, but "[t]o avoid duplicative briefing . . . incorporates by reference" Apricus's memoranda of law in support of its motions. Ferr. Mem. at 1, ECF No. 61. The Court, therefore, adjudicates these motions together.

## BACKGROUND

The following facts are taken from Plaintiffs' complaint, which the Court accepts as true for purposes of this motion. *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). Plaintiffs are French and Luxembourgian companies that develop and market pharmaceutical products in France. Am. Compl. ¶¶ 5–6, 11. Defendant Apricus is a San Diego-based pharmaceutical company that develops products in the areas of urology and rheumatology. *Id.* ¶¶ 7, 13. Plaintiffs' claims relate to a pharmaceutical product called Vitaros, a topically applied cream formulation of alprostadil that was developed by Apricus for the treatment of erectile dysfunction. *Id.* ¶¶ 14, 30, 40.

In November 2013, Plaintiffs entered into a License Agreement with Apricus which granted Plaintiffs exclusive rights to Vitaros patents and trademarks in France, Monaco, and French-speaking Africa. *Id.* ¶ 17. The License Agreement contains a non-compete clause in Section 6.1 that prohibits Plaintiffs, during the term of the License Agreement and for a period of three years thereafter, from "(i) Commercializ[ing] any product containing alprostadil in combination with DDAIP.HCL (other than the Licensed Product), (ii) Commercializ[ing] any product that is intended for use in the Field (other than the Licensed Product) or (iii) Commercializ[ing] any generic version of the Licensed Product." *Id.* ¶ 18. The License Agreement defines "Field" as "the treatment of human, male erectile dysfunction for authorized use only." *Id.* In September 2014, Plaintiffs and Apricus entered into a Manufacturing and Supply Agreement, which provided that Apricus and contract manufacturers would supply Vitaros product to Plaintiffs. *Id.* ¶ 22.

Plaintiffs allege that in the first quarter of 2017, they and Apricus reached an agreement in principle to modify the non-compete clause to allow Plaintiffs to sell generic erectile dysfunction pharmaceutical products in France. *Id.* ¶ 28. Pursuant to a contract executed in March 2017 (the "Purchase Agreement"), Apricus sold to Defendant Ferring its non-U.S. assets and rights related to the development and commercialization of Vitaros. *Id.* ¶ 30–31. Pursuant to the Purchase

Agreement, Apricus assigned to Ferring its License Agreement with Plaintiffs. *Id.* Plaintiffs allege that, during the second quarter of 2017, they expressed to Ferring their desire to modify the non-compete clause of the License Agreement, but Ferring declined to do so. *Id.* ¶ 32. Instead, Ferring "threatened that Majorelle would be held in breach of the License Agreement if it sold generic erectile dysfunction pharmaceutical products in France during the term of the Agreement." *Id.*

## DISCUSSION

I. <u>Legal Standard</u>

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions[] and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). The court must accept the allegations in the pleadings as true and draw all reasonable inferences in favor of the non-movant. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

II.   Analysis

   A. Antitrust Violations

      1. Sherman Act

First, Defendants argue that Plaintiffs' antitrust claims under the Sherman Act must be dismissed because Plaintiffs do not establish antitrust standing or a violation of federal antitrust law. Defs. Mem. at 9, ECF No. 66.

      a. Antitrust Injury

An antitrust plaintiff must show antitrust standing, which is a "threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [a court] must dismiss it as a matter of law." *Gatt Commc'ns, Inc. v. PMC Assocs. LLC*, 711 F.3d 68, 75 (2d Cir. 2013) (affirming district court's dismissal of complaint for lack of antitrust standing pursuant to Rule 12(b)(6)). In order to demonstrate antitrust standing, a plaintiff must allege, among other things, that it suffered an antitrust injury. *Id.* at 76. In order to establish antitrust injury, "the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016) (internal quotation marks and citation omitted).

Plaintiffs contend that their antitrust injury arises from the scope of the relevant non-compete provisions in the License Agreement, which they argue result in an "unreasonable restraint of trade or commerce." Am. Compl. ¶ 50. Plaintiffs allege that they want to "sell generic erectile dysfunction pharmaceutical products in France," but that Defendants refuse to allow them to do so. *Id.* ¶ 32. "[F]oreign injuries that occur[] in foreign markets," however, are "not the type of injury Congress intended to prevent through . . . the Sherman Act." *In re Intel Microprocessor Litig.*, 452 F. Supp. 2d 555, 563 (D. Del. 2006). Plaintiffs do not argue that they currently participate, or have ever participated, in the U.S. market, Pls. Opp. at 8–15, ECF No. 77, alleging only that the non-compete

4

clauses "prevent[] Plaintiffs from selling products in the [Generic Tablet Market and Generic Vitaros Market] in the United States." Am. Compl. ¶¶ 53, 58.  Although a competitor "that has not yet entered a market may also suffer antitrust injury if it was illegally prevented from doing so," the "would-be competitor must demonstrate its 'intention and preparedness' to enter the relevant market." *Biocad, JSC v. F. Hoffman-La-Roche, Ltd.*, No. 16 Civ. 4226, 2017 WL 4402564, at *4 (S.D.N.Y. Sept. 30, 2017) (quoting *Reaemco, Inc. v. Allegheny Airlines*, 496 F. Supp. 546, 553 (S.D.N.Y. 1980)); *see also Am. Banana Co. v. United Fruit Co.*, 166 F. 261, 264 (2d Cir. 1908) ("[I]t is necessary to state facts showing an intention and preparedness to engage in business.").

"In the context of claims involving entrance into the U.S. pharmaceutical market—a highly regulated industry—Plaintiffs alleging intention and preparedness must demonstrate a likelihood of FDA approval of the would-be competitive drug, since such approval is a prerequisite for any drug to enter the U.S. pharmaceutical market." *Biocad*, 2017 WL 4402564, at *4.  Courts, therefore, require plaintiffs to allege that FDA approval of the drug is at least "probable." *Id.*; *see also In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 207 (E.D.N.Y. 2003) (finding no antitrust standing where the complaint "[did] not allege that [plaintiffs] filed an [Abbreviated New Drug Application] or that FDA approval was probable").  Plaintiffs alleging intent and preparedness to enter a pharmaceutical market "typically include facts regarding the stage of the FDA-approval process their product has reached or the steps the plaintiff has taken (or plans to take) to secure approval." *Biocad*, 2017 WL 4402564, at *4.

Here, Plaintiffs have not merely failed to allege that they filed an Abbreviated New Drug Application or for FDA approval—they have failed to supply any facts whatsoever regarding the FDA approval process for its biosimilars.  Plaintiffs vaguely allege that "[p]roducts in the Generic Tablet Market are expected to become commercially available in the United States in the future" and that "[t]here is no cream-based, transdermal medication for the treatment of human erectile

dysfunction commercially available in the United States." Am. Compl. ¶¶ 39, 41.  Similar to *Biocad*, Plaintiffs here

> provide[] no information about the expected timeline for approval, what clinical trials would be required, whether it has begun conducting clinical trials, its expected FDA application date, whether it has begun preparing an application, whether it has contacted the FDA, whether it has ever obtained approval for other biosimilar drugs from the FDA, or whether its contemplated approval would require a New Drug Application or an Abbreviated New Drug Application.

2017 WL 4402564, at *4.  Plaintiffs' only allegation regarding intent and preparedness is that they have "the future ability to directly or indirectly sell [generic erectile dysfunction products] in the United States such that the injury is not speculative." Am. Compl. ¶ 63.  Plaintiffs, in short, have provided little information from which the Court "may assess the likelihood of approval of its biosimilars, and [have] thus failed to allege more than 'a hope or expectation' of engaging in the U.S. pharmaceutical market." *Biocad*, 2017 WL 4402564, at *4 (quoting *Reaemco, Inc.*, 496 F. Supp. at 554).  Plaintiffs do not dispute this point, arguing only that the fact that they have "not alleged imminent preparedness to enter the relevant market in the United States is irrelevant" because "[t]he locus of imminent harm is France."[2]  Pls. Opp. at 14.  Indeed, Plaintiffs' factual allegations relate exclusively to their harm in France, not efforts to enter the U.S. market, and "in fact underscore [their] lack of background and experience in the U.S. pharmaceutical market and the absence of contracts to enter the business of selling its biosimilars in the United States." *Biocad*, 2017 WL 4402564, at *4.

---

[2] To the extent the complaint can be read to allege injuries in France, those injuries do not give rise to an antitrust injury for the reasons set forth in Part II.A.1.c of this opinion.  *See, e.g.*, *Biocad*, 2017 WL 4402564, at *4 n.5; *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 307 (3d Cir. 2002) ("Plaintiffs' injuries occurred exclusively in foreign markets.  They are not of the type Congress intended to prevent through . . . the Sherman Act.").  It does not matter that—as Plaintiffs argue—"the parties have contractually agreed that the License Agreement is to be governed by and construed in accordance with the laws of New York, including the Sherman Act, *regardless of where the harm occurs*." Pls. Opp. at 9 (emphasis in original).  "The subject matter jurisdiction of the federal district courts is limited," *DiNapoli v. DiNapoli*, No. 95 Civ. 7872, 1995 WL 555740, at *1 (S.D.N.Y. Sept. 19, 1995), and "[a] forum selection clause . . . is not sufficient to confer subject matter jurisdiction on this Court." *Velasquez v. Parmalat SpA*, No. 99 Civ. 9038, 2000 WL 294840, at *2 (S.D.N.Y. Mar. 21, 2000); *see also Cable Television Ass'n v. Finneran*, 954 F.2d 91, 94 (2d Cir. 1992) ("[P]arties may not confer subject matter jurisdiction on the court by consent.").

For these reasons, the Court finds that Plaintiffs have failed to set forth facts demonstrating its intention and preparedness to engage the U.S. pharmaceutical market, and thus have failed to allege that they have suffered an antitrust injury.

### b.  Unreasonable Restraint of Trade

Even assuming, *arguendo*, that Plaintiffs allege antitrust injury, they fail to allege the elements of an unreasonable restraint of trade.  Section 1 of the Sherman Act prohibits "only unreasonable restraints of trade." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012).  Exclusive dealing arrangements, like the one Plaintiffs allege, "must be evaluated under the so-called 'rule of reason.'" *Mazda v. Carfax, Inc.*, No. 13 Civ. 2680, 2016 WL 7231941, at *4 (S.D.N.Y. Dec. 9, 2016) (quoting *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 181–82 (2d Cir. 2016)).  Under the rule of reason, a restraint is unreasonable if its "anticompetitive effects outweigh its procompetitive effects." *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)).  To reach that conclusion, courts engage in a three-step inquiry: first, "the plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an actual adverse effect on competition as a whole in the relevant market." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506–07 (2d Cir. 2004) (internal quotation marks, emphasis, and citation omitted).  Second, "[i]f the plaintiffs satisfy their initial burden, the burden shifts to the defendants to offer evidence of the pro-competitive effects of their agreement." *Id.* at 507.  And third, "[a]ssuming defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means." *Id.*

At the first step of this analysis, a plaintiff must first allege a relevant, plausible product market that bears a "rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand." *Todd*

7

*v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (internal quotation marks omitted). The relevant market must include all products that are "'reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) (citation omitted). "Absent an adequate market definition, it is impossible for a court to assess the anticompetitive effect of challenged practices." *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 392 (S.D.N.Y. 1993)). A failure to include reasonably interchangeable products or to assess the cross-elasticity of demand, therefore, renders the market definition legally insufficient and is grounds for granting a motion to dismiss. *See Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008).

Plaintiffs allege that Section 6.1(ii) of the License Agreement restrains it in the "Generic Tablet Market," which it defines as "generic oral tablet medications used for the treatment of human, male erectile dysfunction." Am. Compl. ¶¶ 36–39. In describing the relevant market, Plaintiffs allege only that "[p]roducts in the Generic Tablet Market are generally not interchangeable with Vitaros®, and products in the Generic Tablet Market have a low cross-elasticity of demand with Vitaros®." *Id.* ¶ 42; *see also id.* ¶ 52 ("Section 6.1(ii) is unreasonably broad in scope because it prevents Plaintiffs from selling products in the Generic Tablet Market, which are not interchangeable with Vitaros®."). Plaintiffs argue that these facts are sufficient to establish a relevant market for "generic tablet erectile dysfunction medications," and that this market is "separate and distinct from the market for cream-based, topically applied" medications like Vitaros. Pls. Opp. at 12–13. Defendants contend that these allegations are insufficient because (1) they do not explain "why customers would not treat generic tablets, Vitaros, or any other erectile dysfunction treatment as interchangeable substitutes"; (2) they do not explain the product market with well-pled facts including those "regarding cross-elasticity of demand and interchangeable substitutes," and (3) they

8

do not include allegations "about the size of the proposed market, the participants, their market shares, or any other information." Defs. Mem. at 13. The Court agrees.

Although Plaintiffs allege a broad "Generic Tablet Market," they offer no facts "regarding the size of this proposed market, market participants, market shares, or any other information to guide the Court in assessing its validity." *Planetarium Travel, Inc. v. Altour Int'l, Inc.*, 97 F. Supp. 3d 424, 430 (S.D.N.Y. 2015). Plaintiffs argue that *Planetarium* "did not hold that every sufficiently-pled antitrust claim must allege the size of the proposed market, market participants, and market shares," Pls. Opp. at 12, but even so, Plaintiffs still need to allege facts that allow the Court to perform an "analysis of the interchangeability of use or the cross-elasticity of demand for potential substitute products." *Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982). Here, Plaintiffs' allegations as to the relevant product market are limited, vague, and conclusory.[3] *See, e.g.*, *Am. Sales Co. v. AstraZeneca AB*, No. 10 Civ. 6062, 2011 WL 1465786, at *3 (S.D.N.Y. Apr. 14, 2011) (holding that plaintiff's allegations did not plausibly allege a relevant market consisting solely of Prilosec OTC and its generic counterpart where he "failed to allege any product characteristics or evidence of consumer buying patterns that limit Prilosec OTC's interchangeability of use or the cross-elasticity of demand," including failure to allege "why a consumer would not view any other number of products as adequate substitutes for treatment of frequent heartburn"); *Gianna Enters.*, 551 F. Supp. at 1354 ("The Court cannot accept the market boundaries offered by plaintiff without at least a theoretically rational explanation for excluding [potential substitutes]."). The Generic Tablet Market, therefore, is legally insufficient under the Sherman Act. *See Bayer Schering Pharma AG v.*

---

[3] To the extent that Plaintiffs' brief in opposition attempts to defend the complaint's market definition, it sets forth factual representations beyond the four corners of the complaint. *See* Pls. Opp. at 12 n.4 (explaining that the market for Vitaros is distinct because "Vitaros is prescribed by doctors only as a second-line treatment, whereas Cialis® and Viagra® are first-line drugs," and unlike these two products, "Vitaros has virtually no delay and does not require sexual stimulation"). "[A] party is not entitled to amend its complaint through statements made in motion papers." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998). The Court, therefore, does not consider these assertions because "[n]ew facts and allegations, first raised in a Plaintiff's opposition papers, may not be considered in deciding a motion to dismiss." *Univ. Trading & Inv. Co., Inc. v. Tymoshenko*, No. 11 Civ. 7877, 2012 WL 6186471, at *1 (S.D.N.Y. Dec. 12, 2012).

*Sandoz, Inc.*, 813 F. Supp. 2d 569, 578 (S.D.N.Y. 2011) (dismissing Section 1 claims where plaintiff did not "allege sufficient facts about other [drug] treatments to make its proposed product market plausible").

Plaintiffs also allege that Section 6(iii) of the License Agreement restrains them in the "Generic Vitaros Market," defined as "any generic version of Vitaros®." Am. Compl. ¶ 55. This market, however, is also legally insufficient, as Plaintiffs fail to allege any facts explaining why generic Vitaros is its own product market. *See generally id.* ¶¶ 55–59. Single-brand markets "sidestep[] the need to allege cross-elasticity of demand or any reasonably interchangeable substitutes." *Mooney v. AXA Advisors, LLC*, 19 F. Supp. 3d 486, 500 (S.D.N.Y. 2014). The Supreme Court has also expressed skepticism for single-brand markets because "this power that . . . manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 392–93 (1956). Courts, therefore, routinely reject markets defined by a single product or brand. *See, e.g.*, *Planetarium Travel*, 97 F. Supp. 3d at 429; *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010) (collecting cases). Without alleging all reasonably interchangeable substitutes for generic Vitaros or a plausible explanation for why the Court should regard competition for generic Vitaros as a market unto itself, Plaintiffs have failed to adequately allege a relevant market, which is an essential element to stating a claim under the Sherman Act.

    c. Other Deficiencies

Plaintiffs' antitrust claims under the Sherman Act are also deficient because, in order to state an antitrust claim under the rule of reason, Plaintiffs must allege that the alleged restraint "harmed competition in [the] proposed market." *Mooney*, 19 F. Supp. 3d at 503. Plaintiffs can satisfy this requirement by alleging facts that show "that the alleged restraint had 'an actual adverse effect on

10

competition, such as reduced output,' or by demonstrating an adverse effect 'indirectly by establishing that [Defendants] had sufficient market power to cause an adverse effect on competition.'" *Id.* (quoting *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998)). The complaint does not allege that the market has been adversely affected as a result of the non-compete clauses; it alleges only that "[r]estriction of potential sellers of products in such markets has the effect of restricting supply and distribution, ultimately resulting in higher end prices for consumers." Am. Compl. ¶ 60. This is insufficient, however, to allege how either the Generic Tablet Market or the Generic Vitaros Market adversely affects competition or consumers—"*i.e.*, that it causes harm to competition, not just harm to [Plaintiffs]." Defs. Mem. at 14. Without more, this alleged injury does not constitute actionable harm, because "consumers' inability to buy the same product from a different seller only harms that seller, and does no cognizable harm to competition as a whole." *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 620 (S.D.N.Y. 2013).

Moreover, as Defendants' argue, the Foreign Trade Antitrust Improvements Act ("FTAIA") bars Plaintiffs from relying on foreign conduct and injury to prove its Sherman Act claim. 15 U.S.C. § 6a. Under the FTAIA, only two types of foreign commerce are subject to the Sherman Act: conduct involving import trade or import commerce, and "conduct involving nonimport trade or nonimport commerce when that conduct (1) has a direct, substantial, and foreseeable effect on import trade or import commerce, and (2) the Sherman Act claim arises out of that effect." *Biocad*, 2017 WL 4402564, at *7 (internal quotation marks and citation omitted). Courts refer to the first category as the "import exception" and the second as the "domestic effects exception." *Id.*

The allegations plainly do not fall within the first type of foreign commerce, as Plaintiffs do not allege any foreign anticompetitive conduct "with an immediate impact on U.S. markets."[4] *Maricultura Del Norte v. World Bus. Capital, Inc.*, 159 F. Supp. 3d 368, 383 (S.D.N.Y. 2015). Plaintiffs' claims similarly do not fall within the domestic effects exception. This exception requires two distinct inquiries: "one asking whether the defendants' foreign conduct caused a cognizable domestic effect, and the other asking whether that effect caused the plaintiff's injury." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 414 (2d Cir. 2014). In *Biocad*—a factually similar case—the plaintiff alleged that the defendants' foreign conduct prevented him from entering the U.S. market, which would have the "eventual domestic effect of driving up the price of the [d]rugs in the United States." 2017 WL 4402564, at *10. The *Biocad* Court held that this "attenuated chain of causation [was] insufficient to establish a 'direct, substantial, and reasonably foreseeable effect' under the FTAIA." *Id.* Here, Plaintiffs' allegation that "[r]estriction of potential sellers of products in such markets . . . ultimately result[s] in higher end prices for consumers" leads the Court to similarly conclude that Plaintiffs have not demonstrated either a direct, substantial, or reasonably foreseeable effect on U.S. commerce. Am. Compl. ¶ 60. Nor do Plaintiffs sufficiently allege that any such effect gives rise to a claim under the Sherman Act, instead alleging facts that suggest the opposite—that neither generic tablets nor generic Vitaros are currently available or FDA-approved in the United States—and thus that there is no effect. *Id.* ¶¶ 39, 41.

With respect to the injury suffered, Plaintiffs allege that the non-compete clauses prevent them from selling products in the Generic Tablet and Generic Vitaros Markets in the United States. *Id.* ¶¶ 53, 58. Plaintiffs allege, however, that while they are "ready to sell generic erectile dysfunction

---

[4] Indeed, Plaintiffs allege no facts suggesting any impact on U.S. markets, stating only that: (1) Plaintiffs are "ready to sell generic erectile dysfunction products in France"; (2) Plaintiffs have the "future ability to directly or indirectly sell same in the United States"; and (3) "[r]estriction of potential sellers of products in such markets has the effect of restricting supply and distribution, ultimately resulting in higher end prices for consumers." Am. Compl. ¶¶ 60, 63.

products in France," they only "[have] the future ability to directly or indirectly sell in the United States." *Id.* ¶ 63. Any alleged harm suffered by Plaintiffs, therefore, has been directly caused by the foreign effects of Defendants' alleged conduct, namely lost foreign sales in France. The FTAIA, however, requires a plaintiff to allege that its claims were directly caused by the *domestic effects* and not the foreign effects. *Compare In re Vitamin C Antitrust Litig.*, 904 F. Supp. 2d 310, 319 (E.D.N.Y. 2012) (finding that domestic effects exception applied where defendants' agreement to restrain production and fix vitamin C prices increased prices of vitamin C to be delivered to the United States), *with In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 989 (9th Cir. 2009) (domestic effects exception not satisfied where plaintiff was "a foreign consumer that made its purchases entirely outside of the United States"). Here, Plaintiffs' alleged injuries flow from Defendants' allegedly anticompetitive foreign conduct, not the domestic effects of that conduct. They are, therefore, the type of "independently caused foreign injur[ies]" that fall outside the reach of the domestic effects exception.[5] *Lotes*, 753 F.3d at 414.

Accordingly, Defendants' motion to dismiss Plaintiffs' antitrust claim under the Sherman Act (First Cause of Action) is GRANTED.

### 2. Foreign Laws

Plaintiffs also bring their antitrust claim against Defendants under French and European Union antitrust laws. Am. Compl. ¶¶ 35–66. Defendants argue that, upon dismissal of Plaintiffs' antitrust claim based on U.S. law, the Court should decline to exercise supplemental jurisdiction over those based on foreign law. Defs. Mem. at 19. The Court agrees that supplemental jurisdiction

---

[5] Plaintiffs' failure to address this argument in their opposition brief, moreover, provides an independent basis to dismiss this claim. Pls. Opp. at 8–15. *See M.M. ex rel. J.M. v. New York City Dep't of Educ.*, No. 09 Civ. 5236, 2010 WL 2985477, at *6 (S.D.N.Y. July 27, 2010) (holding that plaintiffs' failure to respond to defendant's arguments constitutes an abandonment because "[b]y standing mute in the face of the [defendant's] jurisdictional challenge, Plaintiffs effectively concede that they cannot carry their burden and that the Court lacks subject matter jurisdiction over the claims against [defendant]").

would not be properly exercised as to Plaintiffs' antitrust claims based on foreign law. Under 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." The factors relevant to this discretionary determination favor declining to exercise supplemental jurisdiction here, as antitrust is a novel, developing area of law, and the Court has no familiarity with France's or the European Union's antitrust laws. *See, e.g.*, *Info. Res., Inc. v. Dun & Bradstreet Corp.*, 127 F. Supp. 2d 411, 418 (S.D.N.Y. 2000) (declining to exercise supplemental jurisdiction because the antitrust claims "present[ed] sufficiently novel and complex issues of foreign law").

Accordingly, Plaintiffs' antitrust claim under foreign law (First Cause of Action) is DISMISSED without prejudice to renewal in state court.

      B.  State Law Claims

Plaintiffs also assert common law claims for illegal restraint on trade, breach of contract, unjust enrichment, and fraud. Am. Compl. ¶ 67–105. Having dismissed Plaintiffs' federal law claim, the Court declines to exercise supplemental jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367(c). *See Pension Benefit Guar. Corp. ex rel. Saint Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) ( "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

Accordingly, Plaintiffs' common law antitrust, breach of contract, unjust enrichment, and fraud claims (Second, Third, Fourth, and Fifth Causes of Action) are DISMISSED without prejudice to renewal in state court.

C. Motions to Strike

Defendants also move to strike Plaintiffs' request for punitive damages. ECF Nos. 56, 58. In light of the foregoing, these motions are moot.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are GRANTED with respect to Plaintiffs' Sherman Act claim. Because the Court declines to exercise supplemental jurisdiction over Plaintiffs' foreign and state law claims, those claims are DISMISSED without prejudice to renewal in state court. Defendants' motions to strike Plaintiffs' request for punitive relief are DENIED as moot.

The Clerk of Court is directed to terminate the motions at ECF Nos. 55, 56, and 58, and to close the case.

SO ORDERED.

Dated: September 21, 2018
      New York, New York

_____
ANALISA TORRES
United States District Judge